# RULE 9 WARRANT

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| V. | ) | INDICTMENT BY THE GRAND JURY |
| | ) | I.D.# 0303005627 |
| SHURON SPENCER | ) | |

The Grand Jury charges **SHURON SPENCER** with the following offenses;

### COUNT I. A FELONY

O-8

#N_____

*(handwritten: take one)*

✗ ASSAULT SECOND DEGREE in violation of Title 11, Section 612 of the Delaware Code of 1974, as amended. *(handwritten: Double Jeopardy)*

**SHURON SPENCER**, on or about the 7th day of March, 2003, in the County of New Castle, State of Delaware, did intentionally or recklessly cause physical injury to Lamar Scott, by means of a deadly weapon, by shooting him with a gun in the leg area.

### COUNT II. A FELONY

O-8

#N_____

✗ ASSAULT SECOND DEGREE in violation of Title 11, Section 612 of the Delaware Code of 1974, as amended.

**SHURON SPENCER**, on or about the 7th day of March, 2003, in the County of New Castle, State of Delaware, did intentionally or recklessly cause physical injury to Lamar Scott, by means of a deadly weapon, by shooting him with a gun in the buttock area.

3-20

## COUNT III. A FELONY

#N_____

POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY in violation of Title 11, Section 1447A of the Delaware Code of 1974, as amended.

SHURON SPENCER, on or about the 7th day of March, 2003, in the County of New Castle, State of Delaware, did knowingly possess a handgun, a firearm as defined by Title 11, Section 222 of the Delaware Code of 1974, as amended, during the commission of Assault Second Degree, a felony as set forth in Count I of this indictment which is incorporated herein by reference.

*[handwritten annotations: "take one", "Double Jeopardy"]*

## COUNT IV. A FELONY                    3-20

#N_____

POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY in violation of Title 11, Section 1447A of the Delaware Code of 1974, as amended.

SHURON SPENCER, on or about the 7th day of March, 2003, in the County of New Castle, State of Delaware, did knowingly possess a handgun, a firearm as defined by Title 11, Section 222 of the Delaware Code of 1974, as amended, during the commission of Assault Second Degree, a felony as set forth in Count II of this indictment which is incorporated herein by reference.

## COUNT V. A FELONY                    1-8

#N_____

POSSESSION OF A DEADLY WEAPON BY A PERSON PROHIBITED in violation of Title 11, Section 1448 of the Delaware Code of 1974, as amended.

SHURON SPENCER, on or about the 7th day of March, 2003, in the County of New

Castle, State of Delaware, did own, possess, or control a handgun, a deadly weapon as defined under Title 11, Section 222 of the Delaware Code of 1974, as amended, after having been convicted in Criminal Action Number IN99-10-1300, in the Superior Court of the State of Delaware, in and for New Castle County on or about January 18, 2000, to the felony charge of Possession of a Controlled Substance Within 1000 Feet of a School.

A TRUE BILL

_____
(FOREPERSON)

_____
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

Page 5

1  think it helps to get to a fair determination of the
2  issue of guilt or innocence of my client, if the
3  victim's truthfulness, which is what this whole
4  statute seems to go to, this whole rule. So, my
5  position is, on behalf of my client, that I should be
6  permitted to ask him if he's -- he was convicted
7  after -- found delinquent, or whatever the right
8  words would be, of a forgery second degree in 1998, I
9  believe it was --
10       MR. VELLA: Actually, '99.
11       MR. LUKOFF: 'Ninety-nine in the Family
12 Court, I guess he was 17 at the time.
13       THE COURT: It seems to me we need
14 something more than a credibility issue, though,
15 because if the only standard for admitting a juvenile
16 conviction is a credibility issue, then it would
17 always be admitted, because a witness's credibility
18 is always an issue, unless they're authenticating a
19 document or something of that nature. It seems, to
20 me, we need a little more showing than just this
21 witness's credibility is an issue. In other words,
22 let's say, for example, the witness had been
23 convicted of a drug offense and, for whatever reason,

Page 6

1  that was relevant to the crime for which the
2  defendant is accused because of the relationship of
3  the defendant and the witness, let's say.
4        So, I think we're going to have -- I'm
5  going to reserve ruling on this because I don't know
6  what the witness is going to say yet. But my initial
7  reaction is, you're going to need to demonstrate
8  something a little more than credibility. We're
9  going to need to demonstrate something, this
10 conviction is necessary for a fair determination of
11 the issue of guilt or innocence.
12       MR. LUKOFF: Well, and the testimony of
13 the one person who claims my client did it is what
14 the State's entire case, or almost entire case, rises
15 or falls upon. So, it's clearly necessary for the
16 determination, fair determination. Yes, credibility
17 alone which should be sufficient, I guess, for the
18 adult to get it, I'm not sure what else one would be
19 able to do.
20       I suspect if it was an adult and my
21 client were claiming self-defense against someone who
22 had a bad record and my client knew that, then it
23 might be a little easier. But here we're talking

Page 7

1  about the man is going to testify. But, either way,
2  I guess we'll go along and, at some point, your Honor
3  will let me know if I can ask the question or not
4  before I ask it. I will somehow -- I guess we can
5  together sidebar and then --
6        THE COURT: What I would request is that
7  we come to sidebar and you can make some additional
8  argument if you wish to.
9        MR. LUKOFF: I don't know if there's any
10 case law --
11       THE COURT: I do see a case here, Harris
12 v. State, but it's not very helpful here. It just
13 simply says, "Where the defendant could not explain
14 why evidence of the witness's juvenile convictions
15 was necessary for a fair determination of guilt and
16 innocence, such impeachment evidence was not
17 necessary and the Court did not abuse its discretion
18 by excluding the evidence." So, I'd be interested
19 in -- perhaps I can have that case retrieved.
20       When is this witness going to take the
21 stand? Is this the first witness.
22       MR. VELLA: Yes, your Honor.
23       MR. LUKOFF: It is, your Honor.

Page 8

1        MR. VELLA: And, your Honor, I can advise
2  the witness that he may be cross-examined on that.
3  My only concern is preparing him for it, and I'll
4  just advise him he may be -- I may ask him about
5  it -- or, actually, I won't unless the -- if the
6  Court rules a certain way, I will ask him about it.
7  But if the Court -- I will just tell him to be
8  prepared to address that, if it's necessary.
9        THE COURT: Is there a way in this
10 courtroom that we can contact my law clerk? Because
11 I could have her print out a copy of the case and I
12 can take a look at it.
13       MR. LUKOFF: Does the Court have her
14 extension?
15       THE COURT: My secretary's extension is
16 50668.
17       THE BAILIFF: What do you need?
18       (Sidebar between Court and bailiff not
19            reported.)
20       MR. VELLA: The second issue, your Honor,
21 is a little more troubling. Christopher Price is the
22 person who drove the car to the gas station with the
23 defendant in it, was in the car when the shooting

Page 9

1 occurred. He observed the defendant get back in the
2 car and have a gun. He's a critical witness to the
3 State, because he can identify the defendant and
4 identify the fact that he had a gun.
5         I spoke to Christopher Price last week on
6 the phone, advised him of the subpoena that he had
7 received, and told him that meant he had to come to
8 Court. I spoke to him this morning when he didn't
9 show up at 9:00 o'clock. He was still at home. I
10 told him we'd be sending a patrol car out to get him
11 to bring him in, because he was having trouble with
12 transportation. When the patrol car got there, he
13 was there. He apparently left in quite a hurried
14 manner, and Detective Chaffin has been in contact
15 with his girlfriend. The girlfriend has told
16 Detective Chaffin that defendant's friends on the
17 outside have talked to Mr. Price and told Mr. Price
18 as late as last week that, in fact, if he showed up
19 and testified, he'd wind up in a wheelchair. Those
20 are the words he gave to us.
21         I think there are two ways to deal with
22 this. We're -- actually a number of ways. The
23 Court, I think, can issue a capias for Mr. Price.

Page 10

1 He's subpoenaed to be here and he is not here. Court
2 may issue a material-witness warrant, and the State
3 would suggest we can do that.
4         The only problem with that is a
5 logistical problem. Usually, with material-witness
6 warrants, we have to prepare an entire package for
7 the Court. Obviously, because this is kind of late
8 breaking and happening as we're in trial, I'm not
9 going to be able to go and type up a material-witness
10 warrant for the Court.
11         The other option, a third option is, the
12 new rule of evidence. New rule of evidence, I think,
13 was enacted, it's within the last 12 months, and it
14 essentially says -- it's a hearsay rule. And it
15 essentially says if a person is made unavailable
16 because of the efforts of the accused or the
17 defendant, then that person's statement is going to
18 be generally admissible even though it may be a
19 hearsay objection -- I lost my train of thought --
20 may be admitted where normally a hearsay objection
21 would normally be lodged.
22         Now, I don't know that anyone has used
23 that rule yet. And I would suggest that maybe there

Page 11

1 would have to be a determination by the Court that,
2 in fact, the defendant is the person who made -- or
3 the defendant, either himself or through others, is
4 the person who made the witness unavailable. And in
5 this case, the State would suggest the only way to do
6 that really is to gather testimony from Christopher
7 Price's girlfriend and determine whether it's
8 credible or not and determine whether, in fact, it is
9 defendant and the persons doing his bidding that are
10 making Christopher Price unavailable.
11         So, as it stands, the State can still go
12 forward today. We're going to go forward with the
13 victim and with Detective Chaffin. We're going to
14 exert every effort to get ahold of Mr. Price. A
15 capias would probably be helpful, in that we can hold
16 him until he's necessary, and that may wind up being
17 tomorrow morning.
18         THE COURT: And a capias on the basis
19 that he failed to comply with the summons?
20         MR. VELLA: With the subpoena.
21         THE COURT: With the subpoena, excuse me.
22         MR. VELLA: Yes. And your Honor, you
23 know, to be frank with the Court, I earlier advised

Page 12

1 Judge Herlihy, because we had a similar problem in
2 that Mr. Scott kind of took a powder for a while.
3 And I told Judge Herlihy what the situation was, and
4 I was asking him for either a capias or
5 material-witness warrant. His preference was a
6 material-witness warrant, but he also at that time
7 realized, when I told him, "Listen, that's something
8 I have to do, I have to go back to the office and get
9 it done." He said that would be preferable and was
10 willing to continue the case for two days until he
11 found Mr. Price, or the case got dismissed because we
12 couldn't find him.
13         So, I'm not sure what the Court's general
14 practice or preference may be in this case in terms
15 of a material-witness warrant versus a capias. But I
16 just want to put that out to the Court.
17         THE COURT: So, you mean --
18         MR. VELLA: I don't want to say the Court
19 can do or should do one thing or the other. I just
20 want to advise the Court that there are a number of
21 options, and I'm not sure what any particular judge
22 prefers in terms of capias versus a material-witness
23 warrant.

Page 13

1 THE COURT: Is this the hearsay exception
2 rule you were talking about in 804?
3 MR. VELLA: Your Honor, I, unfortunately,
4 do not have a new set.
5 THE COURT: Well, the 2003 volume.
6 MR. VELLA: And I don't even know if it
7 made it into that. That's something I can look up,
8 your Honor, and make a determination and discuss
9 that. I think, if it were come down to that option,
10 because we couldn't find Mr. Price for some reason or
11 another, I'd make sure I have the rule for the Court
12 and make sure we were able to go forward with it with
13 a hearing and have a witness. I'm just putting that
14 out there as an option so I can alert the Court to
15 the fact that we may be trying to do that, and the
16 time we would try to do that would be tomorrow
17 morning and it would be the last witness.
18 So, we're able to go forward today. I
19 think we're going to be able to get all our evidence
20 in today but for Mr. Price's testimony or, in the
21 alternative, tomorrow, try to go forward with a brief
22 evidentiary hearing on whether we can admit his
23 statement in through Detective Chaffin.

Page 14

1 THE COURT: Thank you. Mr. Lukoff?
2 MR. LUKOFF: I don't think we can take a
3 position as to the issue of capias versus
4 material-witness warrant. However, I don't know what
5 the subpoena for him said, and it would be helpful to
6 get that because there may be some mechanism built
7 into that, assuming a subpoena was actually served on
8 him. He may know he's to be here because he spoke
9 with Mr. Vella.
10 As to the second part, I guess it's a
11 little early to see if we have to go that far. But I
12 think we have a lot of problems with -- it would be
13 like a little mini trial, in which we bring in the
14 girlfriend, who is going to either tell us that she
15 observed these events, or she was told these events,
16 then we have a multiple hearsay issues. It's her
17 saying what someone else said and, then, they have to
18 somehow link it to my client. And I think that leads
19 us down to very slippery slopes. Either way, we
20 can -- I mean, do you have the subpoena?
21 MR. VELLA: I do not have the subpoena.
22 But with regard to the hearsay within hearsay, at a
23 question of preliminary fact like an evidentiary

Page 15

1 hearing, suppression fact, the hearsay is admissible,
2 so she can talk about what the boyfriend told her and
3 what her source of knowledge is.
4 I'm not suggesting we put her on the
5 stand necessarily to talk about why he's absent. The
6 ultimate goal would be to have Detective Chaffin
7 testify before jury about what Chris Price told him.
8 So, I'm not looking to get into the girlfriend's
9 statement or anything like that. The reason we would
10 produce the girlfriend is for purposes of an
11 evidentiary hearing, where the Court can determine
12 whether, in fact, the witness is unavailable because
13 of the efforts of the defendant.
14 THE COURT: Well, I'm going to need to
15 see that new rule before I can even make an
16 evaluation as to --
17 MR. VELLA: Absolutely, your Honor, and I
18 would be happy to supply that to the Court.
19 MR. LUKOFF: It may be something that's
20 not necessary. But I just foresee major issues
21 because we -- if she's going to say what someone else
22 said to somebody else, it's like three times hearsay.
23 It's not just direct single hearsay. I think that's

Page 16

1 what put -- either way.
2 THE COURT: I agree. I appreciate you
3 bringing that to my attention. The Court will
4 certainly be sensitive to that issue.
5 Let's see what happens in the afternoon.
6 If we're able to locate the witness and bring him in,
7 then it will moot out all of this.
8 MR. LUKOFF: I suspect the subpoena that
9 was issued probably was the subpoena from the State,
10 probably has built into it the authority of the
11 police to bring in someone on it, but it -- I don't
12 know what it says. I have not seen one of their
13 subpoenas. But either way, we can't object or take a
14 position on whether the Court issues a material
15 witness or capias against a witness there, but we can
16 surely make suggestions as to other issues.
17 THE COURT: Okay, certainly. Thank you.
18 Anything else?
19 MR. VELLA: Just on the capias issue,
20 maybe your Honor would like to take some time to
21 decide. But if the Court were to issue a capias, I
22 think we're able to get the police out looking for
23 him a little quicker.

Page 69

1  on that. I think the Court has received some
2  testimony from the witness, and I'm not sure if the
3  Court wants to make a ruling. I've advised the
4  witness that may be brought up. I didn't bring it up
5  on direct. But I just wanted to give the Court a
6  head's up that that issue is still out there.
7         MR. LUKOFF: If the Court were to rule
8  that you were -- I presume you would ask it yourself.
9  If you don't want to rule --
10        MR. VELLA: Well --
11        THE COURT: I have looked at Harris v.
12 State and I am prepared to -- well, I shouldn't say
13 that. At this point, the decision in Harris v. State
14 was a similar set of facts, juvenile convictions. It
15 was simply the fact of the convictions that went to
16 credibility. And the Court, the Supreme Court ruled
17 that there was not a demonstration sufficient to meet
18 the 609 requirements that it was necessary to the --
19 just a moment, let me get that opinion.
20        It was juvenile convictions for receiving
21 stolen property, attempted robbery, and resisting
22 arrest. The defendant failed to explain why the
23 evidence of the juvenile convictions was necessary

Page 70

1  for a fair determination of guilt or innocence, and,
2  therefore, the Superior Court properly found that the
3  impeachment evidence is not necessary.
4         Now, I can defer my ruling if I'm asked
5  to rule on this now. Knowing no more than that the
6  evidence is not going to be admissible. However,
7  Mr. Lukoff, if you can, through testimony,
8  demonstrate why this is necessary for a fair
9  determination of the issue of guilt or innocence --
10        MR. LUKOFF: I'll do what I can in my
11 questioning, and ask whether or not, and then decide
12 whether or not.
13        (Sidebar conference concluded.)
14        MR. LUKOFF: Do I conclude Mr. Vella is
15 done with the examination of this witness?
16        MR. VELLA: Yes, your Honor.
17        MR. LUKOFF: Okay. Thank you.
18            CROSS-EXAMINATION
19 BY MR. LUKOFF:
20 Q   Mr. Scott, it's my understanding from
21 what you told us a few minutes ago that, when you
22 were at the hospital, you believe that you
23 essentially told Officer Chaffin on the occasions, "I

Page 71

1  don't know who shot me"?
2  A   Yes.
3  Q   Did you tell Detective Chaffin that --
4  A   No.
5  Q   -- at a later time that you knew who did
6  it?
7  A   No.
8  Q   If Detective Chaffin testified that you
9  told him that a fellow named Bart did it, would that
10 be correct or incorrect?
11 A   Can you repeat the question?
12 Q   Detective Chaffin just finished
13 testifying that a fellow named Bart --
14 A   Right.
15 Q   -- nicknamed Bart, you told him that Bart
16 shot you. That was during the second interview.
17        Are you testifying today that you did or
18 did not say that to him?
19 A   Not to -- not to my recollection, I don't
20 remember saying anything of that sort.
21 Q   If you did say it to him, would that have
22 been correct or incorrect? If you said Bart did it,
23 was that correct at that time, or is that not true?

Page 72

1  A   I couldn't say he did it because I don't
2  know if he shot me or not.
3  Q   Okay. You testified you were first
4  interviewed, that was back, according to what the
5  officer testified to, that was, like, at 4:00 o'clock
6  in the afternoon on March 7. Sound about right?
7  A   Yes.
8  Q   All right. And according to the medical
9  records of yours, which are in evidence, they had
10 given you at 3:40 a substance called Dilaudid. Do
11 you know what that is?
12 A   No.
13 Q   Do you know what Phenergan is?
14 A   No.
15 Q   Something they supposedly gave at 3:40?
16 A   No.
17 Q   Okay. And, then, the officer said he
18 came back at 1900, which is 7:00 o'clock. Do you
19 know if you got anything else between 4:00 o'clock
20 and 7:00 o'clock?
21 A   I'm pretty sure I did.
22 Q   You didn't know what it was; right?
23 A   No. I wasn't asking, just telling him to

### Page 73

1  give it to me.
2  Q  Do you know if they gave you any
3  Percocet, the records seem to suggest?
4  A  Yeah, they gave me Percocet during my
5  release.
6  Q  You don't think you got any when you were
7  in the hospital?
8  A  No, I don't think so.
9  Q  All right. Did you have one of those IVs
10 in your arm or in some part of your body?
11 A  Yes.
12 Q  And you were hooked up to one of those
13 things that had the bag and it was dripping stuff
14 into you?
15 A  Yes.
16 Q  Right?
17 A  Yes.
18 Q  How soon after you went in did they put
19 that on --
20 A  Immediately.
21 Q  -- that bag on your arm, do you know?
22 A  Immediately.
23 Q  And that stayed in your arm?

### Page 74

1  A  Until my release.
2  Q  I gather until your discharge?
3  A  Until my release.
4  Q  Okay. The vehicle that was driven away
5  from the Amoco Station that day was, you've described
6  it as a blue or black car?
7  A  Yeah, it was a dark-colored car. It was
8  blue or black.
9  Q  Do you recall what make or model it was?
10 A  It was the one in the picture, I'm pretty
11 sure.
12 Q  So, the one that's in these two photos
13 that have been marked for identification looks like
14 it could be?
15 A  Yeah, it looks like it could be, yeah.
16 Q  All right. The person that got out of
17 the vehicle from the passenger side is the person
18 that shot you; right?
19 A  Yes.
20 Q  And that person was dressed all in black?
21 A  Yes, with a hood on.
22 Q  The hood was up?
23 A  Yes.

### Page 75

1  Q  Was the hood covering that person's face?
2  A  It was tied tight.
3  Q  Kind of like -- looped around?
4  A  The hoodies, when you pull them real
5  tight, the face drawn in.
6  Q  So that --
7  A  It takes from your face being like this
8  and, when you tie your hoodie tight, you can only see
9  this part of your face.
10 Q  All right. Kind of sounds like one of
11 those characters from the park, South Park, keeps
12 around?
13 A  Exactly, exactly.
14 Q  All right. And that person you could not
15 identify?
16 A  No.
17 Q  Can you tell us anything about the
18 person's height or weight or anything of that
19 appearance, if you remember?
20 A  I really can't tell you too much about
21 it, because I really can't -- I don't want to tell
22 you that he was slim and he had all his clothes on,
23 you know.

### Page 76

1  Q  Could you tell who the driver was, male
2  or female?
3  A  No.
4  Q  Where there any other people around the
5  Amoco at the time?
6  A  It was like three more people around the
7  Amoco. And the bus was letting out.
8  Q  There was a bus there?
9  A  Yes.
10 Q  And was that out on the street, I guess?
11 A  Yes.
12 Q  You pumped your own gas?
13 A  I didn't even get a chance to pump my
14 gas, actually.
15 Q  You had pulled up for that purpose?
16 A  Yes.
17 Q  And did the person that got out of the
18 vehicle that shot you, did that person say anything
19 to you?
20 A  No.
21 Q  You know Mr. Spencer?
22 A  Yes.
23 Q  You've known him for four, five years?

Page 77

1  A  Yes.
2  Q  The person that shot you, was that
3  Mr. Spencer?
4  A  I don't want to say no, I don't want to
5  say yes, because I'm not sure.
6  Q  So, what you're saying today is --
7  A  I don't know if --
8  Q  -- you don't know who shot you?
9  A  I don't know who shot me.
10  Q  All right. Could you tell us it was a
11  black or white male or Hispanic?
12  A  He was black.
13  Q  And did that person say anything at
14  all --
15  A  No.
16  Q  -- to you?
17  A  No.
18  Q  Didn't try to take any money from you or
19  anything else?
20  A  No.
21  Q  You're shaking your head?
22  A  No.
23  Q  Officer Chaffin testified that you told

Page 78

1  him that a person known as Bart was the one that shot
2  you; that you were at the service station, he came up
3  to you and started arguing. The argument had
4  something to do with that person's sister, named Net,
5  and that Bart had a problem with you dating her in
6  the past, and he pulled out a small handgun and you
7  told him to put the gun away because it was daylight
8  and there were so many people around, stating he was
9  afraid the police would arrive and arrest both of
10  you. Bart then started shooting and the victim tried
11  to flee. You were then struck in the leg and Bart
12  fled in the black vehicle.
13      That's what the officer's told us today
14  is what you told him back about 7:00 o'clock on
15  March 7 of this year. Did you tell him that?
16  A  Not to my recollection.
17  Q  Do you believe that your mind today at
18  the time -- rather back in March, because of the
19  medications, had any effect upon what you said?
20  A  I wouldn't say that. But I was feeling
21  kind of woozy.
22  Q  You were feeling kind of woozy. Do you
23  remember Officer Chaffin talking to you about what he

Page 79

1  claims information was that he had gotten about the
2  incident from other people?
3  A  Yes.
4  Q  Did you agree or disagree, do you
5  remember, with anything he said?
6  A  I don't remember.
7  Q  Has anybody threatened you to testify the
8  way you have today?
9  A  No.
10      MR. LUKOFF: Let me have a moment,
11  your Honor.
12      Mr. Spencer -- if I may approach the
13  witness, your Honor. I'm sorry, Mr. Scott, I can
14  give him my copy until I can find the duplicate,
15  your Honor.
16  BY MR. LUKOFF:
17  Q  Mr. Scott, on the page that's in front of
18  you, at the top it says doctor's order sheet. Do you
19  see that up on the left side there?
20  A  Yes.
21  Q  Okay. And then it says March 7, '03, and
22  under date, time --
23  A  Yes.

Page 80

1  Q  -- you see it says 1535?
2  A  Yes.
3  Q  Do you understand military time?
4  A  Yes.
5  Q  That's 3:35; right?
6  A  Yes.
7  Q  Then, as you go down, it says, Dilaudid
8  1 milligram, IV, given 1540," and there's some
9  initials after that.
10  A  Mm-hmm.
11  Q  True? Do you agree that's what it says?
12  A  Yes.
13  Q  And, then it says Phenergan,
14  17.5 milligrams, IV, given 1540"?
15  A  Yes.
16  Q  And underneath that, it says, "Dilaudid,
17  1 milligram IV given 1550"; right?
18  A  Yes.
19  Q  So, apparently, they gave you Dilaudid
20  twice and Phenergan once at that point?
21  A  Yes.
22  Q  And, then, you had this IV, it says NSS?
23  And it's at 1540; right?

### Page 57

1 going to be your argument that that will affect the
2 voluntariness of the statement the next time and has
3 affected his perception as to whether those
4 statements were the same?
5          MR. LUKOFF: I think both statements
6 under the influence of medication are suspect. And
7 without testimony of someone as to what the effect of
8 those medications are, I would say both statements
9 are admissible, because he was under the influence of
10 some medication. We don't have testimony from a
11 doctor saying we can look at the record and see what
12 they were. We could conclude what that means. And
13 without a physician saying, "Oh, he would or would
14 not know what he's talking about," I would say at
15 this point there is a significant question about the
16 voluntariness of either statement and, clearly, his
17 memory of those is suspect. Either he's, again,
18 lying or he remembers that he told him the same
19 thing.
20          THE COURT: I don't necessarily think we
21 need expert testimony as to whether or not his
22 perception was impaired. I think he can testify to
23 that. The only issue that we face is whether or not

### Page 58

1 you can ask him whether those statements are
2 inconsistent, but the -- he's already testified that
3 his recollection is that those statements were the
4 same, so I think, at this point, you can certainly
5 cross-examine him at that point on that.
6          If you'd like to ask questions now,
7 however as to the effect of the medication, I'm going
8 to permit that now. And at that point, if you think
9 that there is an issue with voluntariness, we can
10 come back to sidebar.
11          MR. LUKOFF: I think he's already
12 testified about the medicines he took and how they
13 made him sleepy, so that I'm willing to rely upon the
14 testimony he's already given on that point so we
15 don't have to return and Court can decide.
16          THE COURT: Well, my ruling right now is
17 that the foundation has been laid under 3507. We can
18 permit the police officer to testify.
19          (Sidebar conference concluded.)
20          MR. VELLA: Your Honor, at this time, I'm
21 going to ask Mr. Scott to step down and the State is
22 going to call Detective Scott Chaffin.
23          THE COURT: You may step down. The Court

### Page 59

1 can advise Mr. Scott he has to remain -- remain here
2 for cross-examination -- not necessarily in the
3 courtroom, but he has to remain, he's still under
4 subpoena.
5          DETECTIVE SCOTT CHAFFIN,
6 called as a witness, being duly sworn, was examined
7 and testified as follows:
8                DIRECT EXAMINATION
9 BY MR. VELLA:
10     Q    Detective Chaffin, who do you work for?
11     A    Wilmington Police Department.
12     Q    How long have you worked for the
13 Wilmington Police Department?
14     A    Nine years.
15     Q    What is your current assignment?
16     A    I'm a detective assigned to Criminal
17 Investigations Division.
18     Q    Do you recall performing an investigation
19 with regard to a shooting that occurred on March 7 of
20 this year?
21     A    Yes, sir.
22     Q    And in connection with your
23 investigation, did you speak with Lamar Scott?

### Page 60

1     A    Yes, sir.
2     Q    Where did you first speak with him?
3     A    Wilmington Hospital.
4     Q    Was he in a private room, or was he in
5 the emergency room, do you recall?
6     A    He was in one of the emergency rooms.
7     Q    And when you spoke with him, did you ask
8 him about the shooting that had occurred on Heald
9 Street at the Amoco Station?
10    A    Yes, sir.
11    Q    What did Mr. Scott initially tell you
12 about the shooting?
13    A    The first statement was pretty brief. He
14 stated he was at the service station there in the 200
15 block of South Heald Street, at which time he started
16 hearing gunshots, felt that he was hit, and then went
17 to the hospital. That was pretty much the general
18 gist of the first interview.
19    Q    At that time, was he able to identify the
20 person who shot him?
21    A    Not at that time. Or he didn't to me.
22    Q    Did you ask him any questions about who
23 may have done it to him?

Page 61

1   A   Yes.
2   Q   And did he give you any information about
3   the identity of the shooter?
4   A   No, not during the first interview.
5   Q   After you spoke with him that first
6   time -- actually, I'm sorry, back up.
7       How long did that interview take?
8   A   Maybe about 10, 15 minutes.
9   Q   And after that 10- or 15-minute
10  interview, what did you do?
11  A   Went back to Wilmington Police. I spoke
12  with some other detectives that were doing other
13  duties. They went to the scene and so forth. I also
14  spoke with some additional witnesses.
15  Q   Okay. Were you able, in that time
16  period, to gather some more information about the
17  shooting and about the case?
18  A   Yes, sir.
19  Q   And at some time, did you return to
20  Wilmington Hospital and speak with Lamar Scott?
21  A   Yes, sir.
22  Q   About how long after that first time did
23  you go back?

Page 62

1   A   About three hours afterwards.
2   Q   And with this information that you had
3   developed in that three-hour time span, did you
4   confront Mr. Scott with some of that?
5   A   Yes.
6   Q   Did you talk to him again about the
7   shooting?
8   A   Yes.
9   Q   And at that time, what did he tell you?
10  A   At that point, he told me that he did
11  know the subject that shot him. He stated that the
12  subject that shot him was known as Bart, the nickname
13  of Bart. He said that he was at the service station
14  and the subject came up behind him. They started
15  arguing. He stated that the argument was over his
16  involvement with Bart's sister, Net, or Shanette
17  Spencer, at which time Bart pulled out a handgun.
18      Mr. Scott stated that he told Bart to put
19  the handgun away because there was too many people
20  around, at which time Bart started shooting at him.
21  As he started to flee, he felt that he was hit once
22  and, then, for a second time. He said he got in his
23  vehicle but he wasn't able to drive. Another female

Page 63

1   got in the car and drove him to his girlfriend's
2   house, at which time his girlfriend got in the car
3   with him. They, in turn, went to Wilmington
4   Hospital.
5       During that subsequent interview, he also
6   identified Shuron Spencer as being the subject named
7   Bart or the subject that shot him.
8       MR. VELLA: Nothing further at this time.
9       CROSS-EXAMINATION
10  BY MR. LUKOFF:
11  Q   Officer Chaffin, did you reduce those
12  comments of Mr. Scott to writing?
13  A   Yes, sir.
14  Q   Did you put them on -- was it handwritten
15  notes?
16  A   In my report, typed up.
17  Q   The police report, actually. Did you
18  actually take some handwritten notes and later type
19  it?
20  A   Not during that interview.
21  Q   Let's talk about the first interview.
22      That was at 4:00 o'clock, 1600 hours?
23  A   Yes, sir.

Page 64

1   Q   During this one, you didn't take any
2   notes?
3   A   No, sir.
4   Q   And when you wrote at that point about
5   what Mr. Scott, Lamar Scott, told you, Scott Chaffin,
6   was that he was at the service station when he heard
7   gunshots?
8   A   During the first interview, yes, sir.
9   Q   First interview?
10  A   Yes.
11  Q   He felt he was struck and went to the
12  hospital?
13  A   Yes.
14  Q   On further questioning, he stated he did
15  not see who was shooting, he was not having a problem
16  with anyone?
17  A   Yes.
18  Q   Anything else he said in that first
19  statement?
20  A   No, sir, that was the general gist.
21  Q   During that first statement, how did he
22  appear, in terms of when he spoke with you?
23  A   He appeared completely coherent to me.

| PUBLIC DEFENDER OF THE STATE OF DELAWARE |||
|---|---|---|
| EXPERT SERVICES |||
| Client Name: Sharon Spencer | Incarcerated? Location: Gander Hill | Court (circle one): **SC** CCP FC JP |
| PD File # 200401440  DUC Number: 0303005627  NCC  KC  SC | Lead Charge: PFDCF | Capital Case: Yes **No** |
| Assigned Attorney: David Lukoff | Assigned PFE: | Hearing Date: |
| Name of Expert: Lynne Coale, Jeannie Cahill, Ct. Reporters |||

**Medical/Forensics/Psychological and other Allied Fields of Study.**
Check all that apply:
- ☐ Court Appearance  Type of hearing _____
- ☐ Evaluation (circle one) EED, NGRI, GBMI, competency  Other/explain _____
- ☐ Written Report
- ☐ Records Review
- ☐ Other/explain _____

**Interpreters**
Language Needed: _____
___ The Spanish interpreter employed by the office is not available.
Purpose:
- ☐ Interview
- ☐ Court Appearance  Type of hearing _____
- ☐ Other/explain _____
Estimated cost _____

**Transcripts - Check all that apply:**
- ☐ Preliminary Hearing
- ☒ Trial  12-9, 12-10-03
- ☐ VOP
- ☒ Sentencing  2-6-04
- ☒ Other/explain  including motions and rulings

Estimated cost  $705.00, $75.00

**Miscellaneous**
- ☐ Records
- ☐ Copies
- ☐ Photos
- ☐ Other/explain _____

**Justification for the Request:**
Appeal

**Fees:** based on the detailed description of services requested, the maximum allowable fees have been established for this case as follows:
Evaluation, consultation, report _____ (travel included)
Court appearance: _____ ½ day _____ full day (travel included)
Records review _____
Interview _____
Other/explain _____

| Requestor Name: David Lukoff | Phone Number: (302) | Date: 2-11-04 |
|---|---|---|
| Local Office Review/Name: | Phone Number: (302) | Date:  Approved  yes  no |
| Main Office Review/Name: [signature] | Phone Number: (302) 577-5117 | Date: 2-11-04  Approved **yes** no |
| Reason Denied:  ☐ Can be done inter-office  ☐ No funds  ☐ Other | Purchase Order #  Appropriation | Requestor Notified by Fax [signature] |

**Requestor Instructions** – The status of your request can be found in the PD database under expert requests. Once approved, the requestor shall notify the expert. For Medical/Forensics/Psychological and other Allied Fields of Study the expert will receive this form, billing instructions and a purchase order. Payment to the expert will not exceed the established amount. If additional services are needed a new expert services form must be submitted.

**NOTIFY THE EXPERT AND THE MAIN OFFICE IMMEDIATELY IF SERVICES ARE CANCELLED. THE EXPERT IS ENTITLED TO BILL THE OFFICE AT 50% IF NOT NOTIFIED 48 HOURS IN ADVANCE.**

# SENTENCING WORKSHEET   G.H.   Time: 12:45   Sent to Judge: _____

| | |
|---|---|
| Defendant Name: Shuron Spencer | Date: 2/10/04 |
| AKA: | Judge: MMJ |
| ID Number: 0303005627 | DOB: 7/28/81 |

Criminal Action Number: Prefix IN  Number 03-05-0165  Suffix ____

Charge: PFDCF

## FINANCIAL

☐ Pay Costs  ☐ Costs Suspended  ☐ Pay Fine $ ____  ☐ 15%  ☐ 18%  ☐ Fine Suspended:

## IMPRISONMENT/PROBATION

☐ In Violation of Probation/Contempt   ☐ Revoked   ☐ Continued   ☐ Modified   ☐ Discharged

Effective: ____   Beginning: ____

Be imprisoned for **3** years ____ months ____ days   At Level **5**   Ending: ____

Level 5 Treatment: ____   Eff Date: 7/15/03

☒ Min. Mandatory Time: **3 yr**   Title/Sec: ____   ☐ Credit for   ☐ Time Served

☐ Suspended Immediately

☐ Susp After ____ ☐ time served for ____ at Level ____ ☐ Plummer/Home Conf/Day Reporting
☐ Susp After ____ ☐ time served for ____ at Level ____ ☐ Plummer/Home Conf/Day Reporting
☐ Susp After ____ ☐ time served for ____ at Level ____ ☐ Plummer/Home Conf/Day Reporting

Followed By: ____ at Level ____   Balance at Level ____

Probation for ____ at Level ____   Suspended after ____ for ____ at Level ____

☐ Consecutive to:   ☐ Concurrent with:

☐ Level 4 Sentence, Hold at: (circle one) 3  5   ☐ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State Hospital) until competent.

## RESTITUTION

TO: ____   Address: ____   Amount: ____

☐ Determined by Presentence Memo

## CONDITIONS

☐ Pay costs, fines, restitution during ____   ☐ Probationary period   ☐ Previously Ordered

| | | | |
|---|---|---|---|
| ☐ Work Referral | ☐ TASC Supervision/Evaluation | | ☐ SEX OFFENDER: Registration/Community Notification Required. Level 1-4 Sentence: Super Ct to provide notice and register deft. Level 5 Sentence: Dept of Correction to provide notice and register deft. |
| ☐ Pay Costs of Supervision | ☐ One Time Fee | ☐ Determined by Probation | |
| ☐ Community Service: ____ Hours | | | |
| ☐ No Contact with ____ | | ☐ Victim  ☐ Codefendant | |
| ☐ No Driving for ____ | | | |
| ☐ Subst Abuse Eval | ☐ Alcohol Treatment | ☐ Mental Health | |
| ☐ Residential Drug/Alc | ☐ Job Training | ☐ Obtain GED | |
| ☐ Outpatient Drug/Alc | ☐ Fully Employed | ☐ Random Urinalysis | |
| ☐ 4177 DUI Program | ☐ Zero Tolerance | | |
| ☐ Follow Original Conditions of Probation | | | |

(circle one)
**COMMITMENT** (circled)
RELEASE
DEFERRED COMMITMENT

☒ Nolle Prosses entered on remaining charges
☐ Nolle Prosses entered on Criminal Action Number(s): ____

PR $ ____
SH $ ____
TOTAL $ ____

DEF ATTY: Lukoff    DAG: Vella    CLERK: Redmond    CT. REP: Cahill

# SENTENCING WORKSHEET

Time: _____   Sent to Judge: _____

| Defendant Name: Shuron Spencer | Date: 2/6/04 |
|---|---|
| AKA: | Judge: MMJ |
| ID Number: 0303005627 | DOB: 7/28/81 |

Criminal Action Number:  
Prefix **IN**   Number **03-05-0167**   Suffix _____

Charge: Assault 2nd

## FINANCIAL

| ☐ Pay Costs | ☐ Costs Suspended | ☐ Pay Fine $ | ☐ 15%<br>☐ 18% | ☐ Fine Suspended: |
|---|---|---|---|---|

## IMPRISONMENT/PROBATION

☐ In Violation of Probation/Contempt   ☐ Revoked   ☐ Continued   ☐ Modified   ☐ Discharged

Effective: _____  
Be imprisoned for **2** years _____ months _____ days   At Level **5**  
Level 5 Treatment: _____

Beginning: _____  
Ending: _____  
Eff Date: _____

☐ Min. Mandatory Time: _____   Title/Sec: _____   ☐ Credit for _____   ☐ Time Served

☐ Suspended Immediately

☐ Susp After_____ ☐ time served for_____ at Level_____ ☐ Plummer/Home Conf/Day Reporting

☐ Susp After_____ ☐ time served for_____ at Level_____ ☐ Plummer/Home Conf/Day Reporting

☐ Susp After_____ ☐ time served for_____ at Level_____ ☐ Plummer/Home Conf/Day Reporting

Followed By: _____ at Level _____   Balance at Level _____

Probation for _____ at Level _____   Suspended after _____ for _____ at Level _____

☐ Consecutive to: _____   ☐ Concurrent with: _____

☐ Level 4 Sentence, Hold at: (circle one) 3  5   ☐ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State Hospital) until competent.

| RESTITUTION | TO: | Amount: |
|---|---|---|
| ☐ Determined by Presentence Memo | Address: | |

CONDITIONS   ☐ Pay costs, fines, restitution during _____   ☐ Probationary period   ☐ Previously Ordered

☐ Work Referral   ☐ TASC Supervision/Evaluation   ☐ SEX OFFENDER: Registration/Community Notification Required. Level 1-4 Sentence: Super Ct to provide notice and register deft. Level 5 Sentence: Dept of Correction to provide notice and register deft.  
☐ Pay Costs of Supervision   ☐ One Time Fee   ☐ Determined by Probation  
☐ Community Service: _____ Hours  
☒ No Contact with **Lamar Scott**   ☒ Victim   ☐ Codefendant  
☐ No Driving for _____  
☐ Subst Abuse Eval   ☐ Alcohol Treatment   ☐ Mental Health  
☐ Residential Drug/Alc   ☐ Job Training   ☐ Obtain GED  
☐ Outpatient Drug/Alc   ☐ Fully Employed   ☐ Random Urinalysis  
☐ 4177 DUI Program   ☐ Zero Tolerance  
☐ Follow Original Conditions of Probation

(circle one)   **COMMITMENT**   RELEASE   DEFERRED COMMITMENT

☒ Nolle Prosses entered on remaining charges  
☐ Nolle Prosses entered on Criminal Action Number(s): _____

| PR $ |
|---|
| SH $ |
| TOTAL $ |

**DEF ATTY:** Lukoff   **DAG:** Vella   **CLERK:** Redmond   **CT. REP:** Cahill

# SENTENCING WORKSHEET

Time: _____   Sent to Judge: _____

| Defendant Name: | Shuron Spencer | Date: 2/6/04 |
|---|---|---|
| AKA: | | Judge: MMJ |
| ID Number: 00300 5627 | | DOB: 7/28/81 |

Criminal Action Number:   Charge:
Prefix **IN**   Number **03-05-0168**   Suffix _____   **PFDCF**

## FINANCIAL

☐ Pay Costs   ☐ Costs Suspended   ☐ Pay Fine $ _____   ☐ 15%   ☐ 18%   ☐ Fine Suspended:

## IMPRISONMENT/PROBATION

☐ In Violation of Probation/Contempt   ☐ Revoked   ☐ Continued   ☐ Modified   ☐ Discharged

Effective: _____   Beginning: _____
Be imprisoned for **3** years ____ months ____ days   At Level **5**   Ending: _____
Level 5 Treatment: _____   Eff Date: _____

☑ Min. Mandatory Time: **3yr**   Title/Sec: _____   ☐ Credit for   ☐ Time Served

☐ Suspended Immediately
☐ Susp After _____ ☐ time served for _____ at Level _____ ☐ Plummer/Home Conf/Day Reporting
☐ Susp After _____ ☐ time served for _____ at Level _____ ☐ Plummer/Home Conf/Day Reporting
☐ Susp After _____ ☐ time served for _____ at Level _____ ☐ Plummer/Home Conf/Day Reporting

Followed By: _____ at Level _____   Balance at Level _____

Probation for _____ at Level _____   Suspended after _____ for _____ at Level _____

☐ Consecutive to:   ☐ Concurrent with:

☐ Level 4 Sentence, Hold at: (circle one) 3  5   ☐ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State Hospital) until competent.

| RESTITUTION | TO: | Amount: |
|---|---|---|
| ☐ Determined by Presentence Memo | Address: | |

CONDITIONS   ☐ Pay costs, fines, restitution during _____   ☐ Probationary period   ☐ Previously Ordered

☐ Work Referral   ☐ TASC Supervision/Evaluation
☐ Pay Costs of Supervision   ☐ One Time Fee   ☐ Determined by Probation
☐ Community Service: _____ Hours
☐ No Contact with _____   ☐ Victim   ☐ Codefendant
☐ No Driving for _____
☐ Subst Abuse Eval   ☐ Alcohol Treatment   ☐ Mental Health
☐ Residential Drug/Alc   ☐ Job Training   ☐ Obtain GED
☐ Outpatient Drug/Alc   ☐ Fully Employed   ☐ Random Urinalysis
☐ 4177 DUI Program   ☐ Zero Tolerance
☐ Follow Original Conditions of Probation

☐ SEX OFFENDER: Registration/Community Notification Required. Level 1-4 Sentence: Super Ct to provide notice and register deft. Level 5 Sentence: Dept of Correction to provide notice and register deft.

(circle one)
**COMMITMENT**
RELEASE
DEFERRED COMMITMENT

☑ Nolle Prosses entered on remaining charges
☐ Nolle Prosses entered on Criminal Action Number(s):

PR $ _____
SH $ _____
TOTAL $ _____

**DEF ATTY:** Lukoff   **DAG:** Vella   **CLERK:** Redmond   **CT. REP:** Cahill

# SENTENCING WORKSHEET

Time: _____   Sent to Judge: _____

Defendant Name: Thuron Spencer
AKA:
ID Number: 00300 5627
Date: 2/6/04
Judge: MMJ
DOB: 7/28/81

Criminal Action Number:
Prefix: IN   Number: 03-05-0166   Suffix: ___
Charge: Assault 2nd

## FINANCIAL
☐ Pay Costs   ☐ Costs Suspended   ☐ Pay Fine $   ☐ 15%  ☐ 18%   ☐ Fine Suspended:

## IMPRISONMENT/PROBATION
☐ In Violation of Probation/Contempt   ☐ Revoked   ☐ Continued   ☐ Modified   ☐ Discharged

Effective: _____
Be imprisoned for **2** years ___ months ___ days  At Level **5**
Level 5 Treatment: _____
Beginning: _____
Ending: _____
Eff Date: 7/23/03

☐ Min. Mandatory Time: ___   Title/Sec: ___   ☐ Credit for   ☐ Time Served

☐ Suspended Immediately
☐ Susp After___ ☐ time served for___ at Level___ ☐ Plummer/Home Conf/Day Reporting
☐ Susp After___ ☐ time served for___ at Level___ ☐ Plummer/Home Conf/Day Reporting
☐ Susp After___ ☐ time served for___ at Level___ ☐ Plummer/Home Conf/Day Reporting
Followed By:___ at Level___   Balance at Level___

Probation for ___ at Level ___ Suspended after ___ for ___ at Level ___
☐ Consecutive to:   ☐ Concurrent with:

☐ Level 4 Sentence, Hold at: (circle one)   3   5
☐ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State Hospital) until competent.

## RESTITUTION
TO:   Amount:
☐ Determined by Presentence Memo   Address:

## CONDITIONS
☐ Pay costs, fines, restitution during ___   ☐ Probationary period   ☐ Previously Ordered

☐ Work Referral   ☐ TASC Supervision/Evaluation
☐ Pay Costs of Supervision   ☐ One Time Fee   ☐ Determined by Probation
☐ Community Service: ___ Hours
☐ No Contact with ___   ☐ Victim   ☐ Codefendant
☐ No Driving for ___
☐ Subst Abuse Eval   ☐ Alcohol Treatment   ☐ Mental Health
☐ Residential Drug/Alc   ☐ Job Training   ☐ Obtain GED
☐ Outpatient Drug/Alc   ☐ Fully Employed   ☐ Random Urinalysis
☐ 4177 DUI Program   ☐ Zero Tolerance
☐ Follow Original Conditions of Probation

☐ SEX OFFENDER: Registration/Community Notification Required. Level 1-4 Sentence: Super Ct to provide notice and register deft. Level 5 Sentence: Dept of Correction to provide notice and register deft.

(circle one)
**COMMITMENT** (circled)
RELEASE
DEFERRED COMMITMENT

☑ Nolle Prosses entered on remaining charges
☐ Nolle Prosses entered on Criminal Action Number(s):

PR $ ___
SH $ ___
TOTAL $ ___

DEF ATTY: Lukoff   DAG: Vella   CLERK: Redmond   CT. REP: Cahill

# SENTENCING WORKSHEET

Time: _____   Sent to Judge: _____

| | |
|---|---|
| Defendant Name: Shuron Spencer | Date: 2/6/04 |
| AKA: | Judge: MnJ |
| ID Number: 030300 5627 | DOB: 07/28/81 |

**Criminal Action Number:** Prefix N  Number 03-05-0169  Suffix ___

**Charge:** PDWBPP

## FINANCIAL

☑ Pay Costs   ☐ Costs Suspended   ☐ Pay Fine $___   ☐ 15%  ☐ 18%   ☐ Fine Suspended:

## IMPRISONMENT/PROBATION

☐ In Violation of Probation/Contempt   ☐ Revoked   ☐ Continued   ☐ Modified   ☐ Discharged

Effective: _____
Be imprisoned for **2** years ___ months ___ days  At Level **5**
Beginning: _____  Ending: _____

Level 5 Treatment: _____   Eff Date: _____

☐ Min. Mandatory Time: **1 yr**   Title/Sec: _____   ☐ Credit for   ☐ Time Served

☐ Suspended Immediately
☑ Susp After **1 yr**   ☐ time served for ~~Comp~~ at Level **4**   ☑ Plummer/Home Conf/Day Reporting
☐ Susp After **Comp**   ☐ time served for **Comp** at Level **3**   ☐ Plummer/Home Conf/Day Reporting
☐ Susp After _____   ☐ time served for _____ at Level _____   ☐ Plummer/Home Conf/Day Reporting

Followed By: _____ at Level _____   Balance at Level _____

Probation for _____ at Level _____   Suspended after _____ for _____ at Level _____

☐ Consecutive to: _____   ☑ Concurrent with: **now serving**

☐ Level 4 Sentence, Hold at: (circle one) 3  5   ☐ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State Hospital) until competent.

## RESTITUTION

TO: _____   Address: _____   Amount: _____
☐ Determined by Presentence Memo

## CONDITIONS

☑ Pay costs, fines, restitution during _____   ☑ Probationary period   ☐ Previously Ordered

☐ Work Referral
☐ Pay Costs of Supervision
☐ Community Service: _____ Hours
☐ No Contact with **Lamar Scott, family** ☑ Victim  ☐ Codefendant **or residence**
☐ No Driving for _____
☐ Subst Abuse Eval
☐ Residential Drug/Alc
☐ Outpatient Drug/Alc
☐ 4177 DUI Program
☐ Follow Original Conditions of Probation
☐ TASC Supervision/Evaluation
☐ One Time Fee
☐ Determined by Probation
☐ Alcohol Treatment
☐ Job Training
☐ Fully Employed
☐ Zero Tolerance
☐ Mental Health
☐ Obtain GED
☐ Random Urinalysis

☐ SEX OFFENDER: Registration/Community Notification Required. Level 1-4 Sentence: Super Ct to provide notice and register deft. Level 5 Sentence: Dept of Correction to provide notice and register deft.

(circle one)
**COMMITMENT** (circled)
RELEASE
DEFERRED COMMITMENT

☑ Nolle Prosses entered on remaining charges
☐ Nolle Prosses entered on Criminal Action Number(s): _____

PR $ _____
SH $ _____
TOTAL $ _____

**DEF ATTY:** Lukoff   **DAG:** Vella   **CLERK:** Redmond   **CT. REP:** Mahle